# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

_____

**In Re**

EDWARD M. LETTUNICH                 **Bankruptcy Case**
and SANDRA L. LETTUNICH,            **No. 08-02589-JDP**

                **Debtors.**

_____

## MEMORANDUM OF DECISION
_____

**Appearances:**

> Edward Lettunich, Meridian, Idaho, Pro Se Debtor.

> Bob Burril, New Plymouth, Idaho, Pro Se Creditor.

> Conrad Aiken, RACINE OLSON NYE BUDGE & BAILEY, Boise,
> Idaho, Attorneys for Trustee.

> Lance Loveland, PARSONS SMITH & STONE, Burley, Idaho,
> Attorneys for D.L. Evans Bank.

MEMORANDUM OF DECISION - 1

## Introduction

On September 28, 2009, Debtors Edward and Sandra Lettunich

("Debtors") filed a Motion for Allowance of Administrative Expenses and

a supporting affidavit.  Docket Nos. 349, 350.  The chapter 7 trustee, Gary

Rainsdon ("Trustee"), and the major creditor in this case, D.L. Evans Bank

(the "Bank"), objected to the motion.  Docket Nos. 363, 364.[1]  The Court

conducted a hearing on October 29, 2009, and thereafter took the issues

under advisement.  For the reasons set forth below, the Court will grant

the motion, but only in part.  This Memorandum constitutes the Court's

---

[1]  The Bank has standing to object to Debtors' motion.  Administrative expenses are payable from the proceeds of liquidated property of the estate, but only after the claims of secured creditors are paid. *See* 11 U.S.C. § 725; § 726(a)(1); *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 5 (2000). The Court understands the Bank to have objected to Debtors' motion in its status as an unsecured creditor, since it appears the value of the collateral it holds to secure its claim is significantly less than the total amount of that claim. *See* 11 U.S.C. § 506(a).  However, even if the Bank claims a security interest in the cattle sale proceeds, under § 506(c), Trustee can seek to surcharge that collateral to the extent necessary to recover "the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such [secured] claim . . . ."  11 U.S.C. § 506(c); *Hartford Underwriters*, 530 U.S. at 5.  While not an issue at this time, it would seem that Debtors' expenses likely fall into that category.  Therefore, the Bank certainly has a pecuniary interest in the outcome of this contested matter.

MEMORANDUM OF DECISION - 2

findings of fact and conclusions of law and disposes of the motion. Fed. R.

Bankr. P. 7052, 9014.[2]

## Facts

Debtors owned and operated a large cattle operation in

Southwestern Idaho and Eastern Oregon. On November 17, 2008, Debtors

filed a chapter 12 petition, and Forrest Hymas was appointed to serve as

the chapter 12 trustee.

On February 18, 2009, during the pendency of the chapter 12 case,

Debtors sought permission from this Court to sell estate property.

Specifically, Debtors sought permission to sell 194 bulls and 75 cow/calf

pairs. Docket No. 90. Following a hearing, the Court granted Debtors'

request to sell the bulls only, consistent with the terms recited on the

record. An order was entered on March 23, 2009. Docket No. 122.

Debtors paid for a number of expenses in preparation for the sale.

Their expenditures included vaccinations and other medications for the

---

[2] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 - 1532, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001 - 9037.

MEMORANDUM OF DECISION - 3

animals, printing and postage costs to promote the sale, and fuel for the

vehicles that were used to care for the animals.  The sale took place on

March 31, 2009 at the Treasure Valley Auction in Caldwell, Idaho.  The

sale generated approximately $150,000, and the gross proceeds were

turned over to Mr. Hymas.

On April 29, 2009, the case was converted to a chapter 7 case, and

Gary Rainsdon was appointed to serve as liquidating trustee.  On

September 28, 2009, Debtors filed this motion wherein they seek to be

reimbursed for $12,012.69 they claim constitute administrative expenses.

The affidavit of Edward Lettunich, which accompanied the motion,

provides information about the expenses.

## Discussion

The Bankruptcy Code affords a priority status for administrative

expenses.  *In re Coolex*, 96.1 I.B.C.R. 35, 36 (Bankr. D. Idaho 1996); 11 U.S.C.

§ 507(a)(2) (providing second priority status to "administrative expenses

allowed under section 503(b) of this title . . . .").  Whether a claim

constitutes a priority administrative expense is determined under § 503(b),

MEMORANDUM OF DECISION - 4

which provides, in pertinent part:

> (b) After notice and a hearing, there shall be allowed
> administrative expenses, other than claims allowed under
> section 502(f) of this title, including –
>> (1)(A) the actual, necessary costs and expenses of
>> preserving the estate[.]

11 U.S.C. § 503(b)(1)(A). This provision is construed narrowly by the

courts. *Nat'l. Labor Relations Bd. v. Walsh (In re Palau Corp.)*, 18 F.3d 746, 750

(9th Cir. 1994); *In re Sunny Ridge Manor, Inc.* 90 I.B.C.R. 12 (D. Idaho 1990).

A strict construction regarding administrative expenses serves, in part, to

maximize and protect the limited assets of the bankruptcy estate for the

benefit of the unsecured creditors. *Burlington N. R.R. Co. v. Dant & Russell,*

*Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 706 (9th Cir. 1988).

The Ninth Circuit Bankruptcy Appellate Panel has summarized the

requisite elements to establish administrative expense priority as follows:

> [a]dministrative status is allowed when a claim (1) is incurred
> postpetition, (2) directly and substantially benefits the estate,
> and (3) is an actual and necessary expense.

*Gull Indus., Inc. v. John Mitchell, Inc. (In re Hanna)*, 168 B.R. 386, 388 (9th Cir.

B.A.P. 1994) (citation omitted). "The applicant must prove by a

MEMORANDUM OF DECISION - 5

preponderance of the evidence entitlement to the administrative expense."

*Id.*; *In re Coolex*, 96.1 I.B.C.R. at 36.

Debtors have divided their claimed expenses into six separate

categories.  It is undisputed that each of the claimed expenses were

incurred postpetition.  Accordingly, this Court will focus on whether each

claimed expense was actual and necessary, and whether it directly and

substantially benefitted the estate.  Each category is examined in turn.

### 1.    Ear Tags and Vaccinations

The first category of expenses is for ear tags, vaccinations, and other

medicines purchased by Debtors.  Debtors assert that the vaccinations and

ear tags were required prior to selling the bulls, and seek an award of

administrative expenses in the amount of $1,248.27.  Attached to Mr.

Lettunich's affidavit is a summary of these expenses, along with copies of

Debtors' bank statements and cancelled checks.

Trustee and Bank object to these expenses, arguing that without

individual invoices or merchant receipts, it is impossible to tell whether

these expenses were actual costs of preserving the assets of the estate.

MEMORANDUM OF DECISION - 6

However, they offer no evidence to dispute the allegations in the affidavit,

and in particular, do not seem to dispute that the bulls were indeed tagged

and vaccinated prior to sale.

While  invoices and receipts certainly would be additional proof of

these expenses, they are not critical for Debtors to satisfy their evidentiary

burden.  Here, in addition to the bank statements and cancelled checks,

Debtors have offered the affidavit of Edward Lettunich, wherein he

represents that these expenses were actually incurred for vaccinations and

ear tags and that such expenses were necessary in order for the animals to

be sold.  Neither the Trustee nor the Bank have challenged that assertion,

and in the absence of such a challenge, the Court is satisfied that Debtors

have met their evidentiary burden.  These expenses will be allowed as

administrative expenses in the amount requested.[3]

---

[3] There appear to be two inconsistencies between the Debtors' summary
and the bank statements and cancelled checks.  Debtors' summary indicates the
expense for WSI on February 13, 2009 was for $90.48; the bank statement records
show an expenditure of $90.88.  In addition, the expense for Walco on March 30,
2009 is listed in the summary as $25.89, but the cancelled check on the same date
is for $28.89.  Correcting for these apparent errors would result in an additional
$3.40 for the Debtors, but the Court declines to make such an adjustment, and

MEMORANDUM OF DECISION - 7

2.    **Genetic Testing**

The next category of expenses relates to testing the bulls for genetic

defects.  Debtors assert that a new genetic defect became known

throughout the cattle industry in the fall of 2008, and that they were

required to test the bulls for this defect prior to the sale.  Debtors

performed these tests prior to the sale, and now request $289.11 for this

expense.  In support, Debtors have attached a bank statement and an

invoice from MMI Genomics, Inc.  The bank statement has an entry for

MMI Genomics on April 23, 2009 for $240.00.  The invoice reveals a

balance due of $49.11.  At the hearing, Edward Lettunich explained that he

was required to pay $240 up front, when the testing materials were sent to

him, and that the company is still billing him for the balance.  He has not

paid the remaining balance yet, and explained that he has forwarded the

bill to Trustee.

The genetic testing has been shown to be an actual, necessary

---

instead will limit the award of administrative expenses for this category to the
amount supported by Edward Lettunich's affidavit, or $1,248.27.

MEMORANDUM OF DECISION - 8

expense associated with the sale.  However, Debtors are limited to the

actual amount paid for this expense, *i.e.*, $240.[4]

### 3.    Sale Advertising Expenses

Debtors claim $811.88 for expenses they incurred in publishing and

mailing various advertising materials for the March 31, 2009 sale.  Trustee

objected to these expenses as well, again alleging that Debtors' supporting

documentation failed to adequately show that these expenses were actual

and necessary.  At the hearing, Trustee's counsel pointed out that there

was a substantial advertising budget for the sale, and he could not tell

from the documentation provided by Debtors whether these items were

also included in and paid from that budget.  Trustee's counsel further

argued that the chapter 12 trustee had previously reimbursed Debtors for

postage and printing expenses of $168 and $185, respectively, and was

concerned about paying Debtors for the same expense twice.  *See* Trustee's

Ex. A, Docket No. 367.

---

[4] Of course, Trustee is not prevented from paying the balance due on this bill.

MEMORANDUM OF DECISION - 9

As with the first category of expenses, Debtors' supporting documentation includes a summary ledger as well as bank statements and cancelled checks for the expenses claimed.[5]  In addition, Debtors have included a receipt for posters from Dominick's Quick Print.  Edward Lettunich asserts in his affidavit that $811.88 is "the *balance* of the advertising expenses incurred in an effort to promote and market the March 2009 sale."  Docket No. 350 (emphasis added).  He explained at the hearing that he needed to pay these expenses because the chapter 12 trustee did not have sufficient funds available to pay for them.  He also stated that he did not include any expenses in this motion for which the chapter 12 trustee had previously reimbursed him.

A review of Debtors' bank statements supports this explanation.  Although the bank statements include the expenses for printing and postage referenced by Trustee's counsel, neither of those expenses are highlighted nor included in the summary, as are the other expenses for

---

[5]  Debtors have circled each of the appropriate expenses on their bank statements and then included that amount in the summary sheet.  *See* Docket No. 350, Ex. C.

MEMORANDUM OF DECISION - 10

which Debtors are requesting payment.  The Court concludes that Debtors

have adequately shown that these expenses were actual and necessary

costs to preserve the estate and will be allowed as administrative expenses

in the amount of $811.88.

### 4.    Accounting Services

Debtors next request $1,052.19 for the accounting services provided

by Ken Priebe of Treasure Valley Tax Services, Inc.  At the hearing,

Edward Lettunich explained that these services were necessary to

conclude the chapter 12 case, but noted that Debtors had not actually paid

for them.  Upon hearing this, the Court explained to Mr. Lettunich that

Ken Priebe, and not Debtors, is the creditor for this expense, and that it

was his burden to request that such expenses be allowed.[6]  Debtors' claim

for the accounting expenses will not be allowed as administrative

expenses.

---

[6] Of course, as a professional employed by a chapter 12 debtor, the accountant faces an additional significant hurdle to obtain payment, in that, in reviewing the dockets it appears that the Court had not previously approved his employment as required by § 327(a), § 330(a) and Rule 2014(a).

MEMORANDUM OF DECISION - 11

5.    **Fuel**

Prior to the bull sale Debtors were responsible for the health and

maintenance of the herd.  Because the herd was spread out over several

locations in Idaho and Oregon, Debtors incurred significant travel

expenses to care for and maintain the herd.  Debtors request $3,371.24 for

fuel used by Debtors and their employees from the time the chapter 12

petition was filed through May, 2009.  In support of these expenses,

Debtors supplied a summary of the expenses and the associated bank

statements and cancelled checks.  Trustee objected to these expenses also,

arguing again that because Debtors did not provide invoices to tie the fuel

expenditures to the cattle operation they had failed to meet their burden of

proof.  Trustee also notes that many of the expenses were incurred well

after the March 2009 cattle auction, and after the case was converted to

chapter 7.

The total fuel expense on the Debtors' summary sheet matches the

amount Edward Lettunich claimed was incurred in his affidavit.

However, several of the entries in the summary are problematic.  The first

MEMORANDUM OF DECISION - 12

entry on the summary sheet is for fuel in the amount of $2,170.16. It lists

the date of the transaction as "11/09 - 5/09" then identifies the payment

source as "WAMU/Chase Card**." *See* Docket No. 350, Ex. E. At the

bottom of the page appears the notation, "** Please see Credit Card

Statements, charges indicated with a hyphen." *Id.* From the bank

statements provided, it is apparent that Debtors intended to indicate the

beginning of the date range to be November 2008, rather than 2009.

Additionally, while the end of the range is listed as May 2009 and the

statement includes one transaction in May, the last fuel transaction

actually occurred on April 11, 2009.

More troublesome than these minor discrepancies, however, are the

individual entries which are highlighted on the bank statements. Several

of these marked entries identify merchants which may not sell fuel, such

as Lowes, Meineke, and Farm City Animal Supply. Moreover, the total of

all highlighted entries, or $2,731.10, does not match the amount listed on

the summary, or $2,170.16. Even if the questionable entries were excluded

from the final summation, the total would still not match the amount listed

MEMORANDUM OF DECISION - 13

in the summary.[7]  In short, it is unclear why the amount in the summary is

so much less than the total of the highlighted entries in the bank

statements.  Nonetheless, because it is apparent that Debtors incurred at

least $2,170.16 in fuel expenses between the dates listed, that is the figure

the Court will utilize in making its calculations.

Also problematic is the second entry of the summary, which lists

fuel in the amount of $67.00 incurred on March 19, 2009.  Debtors list the

payment source for this expenditure as "Check No. 1015."  Docket No. 350,

Ex. E.  A copy of the cancelled check was also provided, but it is not

helpful here.  There is no payee listed and the notation on the memo line of

the check has been crossed out, rendering it illegible.  While it is

conceivable that the notation may have been for fuel, it is equally plausible

that it was for food or some other expense.  Absent additional explanation,

this particular entry will not be allowed.[8]

---

[7] Excluding these entries would bring the total to $2,437.89.

[8] The purchase on March 29, 2009 for $60.00 was also made with a
personal check.  The cancelled check for that transaction also does not list a
payee, however, the memo line clearly indicates it was for fuel.  This expense will

MEMORANDUM OF DECISION - 14

The Court has no additional concerns with the other entries in

Debtors' summary.  With the exception of the entry on March 19, 2009,

Debtors have shown that their fuel expenses were actual and necessary

costs of preserving the estate.  Accordingly, the Court concludes that

Debtors will be allowed $3,304.24 as an administrative expense for fuel.[9]

**6.    Wages**

The final category in Debtors' request is a salary for Edward

Lettunich for the months of January, February and March, 2009.  Debtors

indicated that $3,500 had previously been budgeted[10] as Edward

Lettunich's salary for each of these months and that only half of that

amount for each month had been paid by Mr. Hymas, the chapter 12

be included in the Court's calculation.

[9]  Those expenses which were incurred prior to April 29, 2009, when the case was converted to chapter 7, will be considered administrative expenses of the chapter 12 estate.  All other expenses will be considered chapter 7 administrative expenses.

[10]  Debtors filed their chapter 12 plan on February 27, 2009.  Docket No. 101.  Attached as Ex. A to that plan is a monthly budget.  This budget includes a monthly salary for Edward Lettunich in the amount of $3,500.  Apparently, this is the budget to which Debtors refer.  Debtors' plan was never confirmed.

MEMORANDUM OF DECISION - 15

trustee.  As a result, Debtors now request that $5,240,[11] the balance of

Edward Lettunich's budgeted salary, be allowed as an administrative

expense for this work.

In support of their request, Debtors note that the Bankruptcy Code

provides that administrative expenses include "the actual, necessary costs

and expenses of preserving the estate, including . . . wages, salaries, and

commissions for services rendered after the commencement of the case[.]"

11 U.S.C. § 503(b)(1)(A)(i).  Edward Lettunich explains in his affidavit that

during these three months he prepared the advertising materials and

performed other duties to promote the bull sale.  In addition, he explained

that he also worked with the cattle by vaccinating, testing, and tagging the

animals prior to the sale.

Trustee objects to this category of expenses because, he argues,

given the limited documentation provided by Debtors it is difficult to tie

Edward Lettunich's labor to the preservation of the assets of the estate.

---

[11]  The Court recognizes that if $3,500 was budgeted for the monthly salary
for the three months, or $10,500 total, then half of that amount would be $5,250.
Debtors only request $5,240.

MEMORANDUM OF DECISION - 16

Trustee also takes issue with this claim since the budget upon which it was

based was never formally approved by the Court because Debtors' plan

was never confirmed.

Trustee's objections are well-taken.  Debtors have not properly

documented, nor provided other adequate evidence to show, that the

services in question were necessary to preserve or dispose of the assets of

the estate, nor to prove the value of those services.   Debtors received a

portion of the "wages" described in the budget; without better proof of the

services they contend give rise to administrative expense status, it is

impossible to tell whether Mr. Lettunich received adequate payment for

those services or not.

These concerns, however, are not the only problems with Debtors'

request.  All of the other expenses approved above as administrative

expenses share a common feature – they represent discrete expenditures

by Debtors for goods or services necessary for the preservation of the

estate provided by or purchased from third-party vendors or entities.  A

request for payment from the bankruptcy estate for the  "salary" of a sole

MEMORANDUM OF DECISION - 17

proprietor chapter 12 debtor is a different matter.  In other words, this

request is founded not on an actual expense which the Debtors incurred,

but rather is premised upon the alleged value attributable of the labor

Edward Lettunich performed on behalf of the estate.  Although

§ 503(b)(1)(A)(i) refers to wages and salaries for services rendered to the

estate post-petition, the Court was unable to locate any case law where the

chapter 12 debtor, operating as a sole proprietor, was allowed an

administrative expense for unpaid wages or a salary for personal services

performed during the case.  This is not surprising since, as one bankruptcy

court explained, this clause in § 503(b) "address[es] situations where it is

necessary to pay the wages, salaries, [and] commissions . . . of a Debtor's

*employees* as part of 'the actual and necessary costs and expenses of

preserving the estate.'"  *In re Am. Home Mortgage, Holdings, Inc.*, 411 B.R.

169, 176 (Bankr. D. Del. 2008) (emphasis added).  Edward Lettunich was

the co-owner of his business; he was not an employee.

While the Court does not doubt that those services Edward

Lettunich performed in preparing the cattle for sale were valuable, they

MEMORANDUM OF DECISION - 18

simply do not qualify as administrative expenses. If the Court were to allow a salary for Edward Lettunich as an administrative expense in this instance, it would open the door for all sole proprietor debtors to advance their own pecuniary interests over that of their creditors by making similar claims, thus fundamentally altering the priority scheme endorsed by Congress.

The creditors do not receive a windfall at Mr. Lettunich's expense as a result of this ruling. Unless the Court orders otherwise, after filing a petition, a chapter 12 debtor remains in possession of property of the estate and conducts the business operation. 11 U.S.C. § 1203. In this case, for example, while financial circumstances compelled the sale of these bulls, at the time of the sale, Edward Lettunich presumably still held out hope to propose and confirm a chapter 12 plan. In that sense, then, his services in preserving cattle and preparing them for sale benefitted Debtors' interest, as well as that of the creditors. That significant efforts may be required to perform a debtor's duties in a bankruptcy case, and that creditors may benefit from those services, does not compel the conclusion that the debtor

MEMORANDUM OF DECISION - 19

should be compensated for those services from the estate before creditors are paid.

Debtors' request for Edward Lettunich's salary to be allowed as an administrative expense will be denied.

## Conclusion

For these reasons, Debtors' motion for administrative expenses will be granted in part. Debtors will be allowed a priority administrative expense in the amount of $5,604.39. Because $4,711.11 of those expenses were incurred prior to the conversion of the chapter 12 case to chapter 7, that amount will be treated as administrative expenses of the chapter 12 case. The balance of the expenses, or $893.28, incurred after conversion, are administrative expenses of the chapter 7 estate. *See* 11 U.S.C. § 726(b) (providing, effectively, that chapter 7 administrative expenses be paid in full before payment is made for administrative expenses incurred prior to conversion). The motion will be denied with respect to any amounts in excess of the expenses approved above.

A separate order will be entered.

MEMORANDUM OF DECISION - 20

Dated:  November 25, 2009

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION - 21